**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
EASTERN DIVISION**

| | |
|---|---|
| 25th Street Group Apartments #1, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>Bremer Bank, National Association,<br><br>Defendant. | **MEMORANUDM AND ORDER**<br><br>Case No. 3:20-cv-167 |

Before the Court are two motions. The first is a motion for partial summary judgment filed by Plaintiff 25th Street Group Apartments #1, LLC, ("25th Street") on September 2, 2021. Doc. No. 33. On September 23, 2021, Defendant Bremer Bank, National Association, ("Bremer") filed a response in opposition to the motion. Doc. No. 42. 25th Street filed its reply. Doc. No. 51. The second motion is Bremer's motion for summary judgment, filed on September 3, 2021. Doc. No. 38. 25th Street filed a response in opposition on September 24, 2021. Doc. No. 43. Bremer filed its reply. Doc. No. 54. For the reasons below, the Court denies 25th Street's motion for partial summary judgment (Doc. No. 33) and grants in part and denies in part Bremer's motion for summary judgment (Doc. No. 38).

I.      **BACKGROUND**

The case before the Court centers on the termination of an interest-rate swap agreement between 25th Street and Bremer and the resulting commercial dispute over the terms of that agreement. In basic terms, the parties to an interest-rate swap agreement essentially "swap" interest rates, or more specifically, swap payments that are based on interest rates. Doc. No. 48-1, p. 20. In some cases, an interest-rate swap is used in conjunction with a loan agreement. Here, 25th Street entered into a loan agreement with Bremer. The loan agreement had a variable interest rate, which

was higher risk than a fixed interest rate. To mitigate that risk, 25th Street and Bremer entered into an interest-rate swap agreement. This interest-rate swap agreement essentially transformed 25th Street's interest rate from a variable rate to a synthetic fixed rate. 25th Street eventually terminated the swap and, as a result, incurred a fee. With this general background in mind, a brief introduction of the parties is necessary.

25th Street is a North Dakota limited liability company and has its principal office in Fargo, North Dakota.[1] Doc. No. 1-3, ¶ 2. Richard Jordahl and Brent Olson are members of 25th Street. Doc. No. 67, p. 5. Jordahl is also the President of 25th Street. Doc. No. 42-3, p. 7. Jordahl has more than 10 million dollars in investments, which include, among other things, investing in farmland and buying and developing land with apartment buildings or rental properties. Doc. No. 67, pp. 6, 9. Additionally, Jordahl is involved in "a number of different entities," including at least a dozen limited liability companies, and about half of the entities Jordahl is involved in include Olson. Id., p. 6. Olson, a certified public accountant with an active license, serves as the secretary/treasurer of 25th Street. Doc. No. 48, pp. 17-20. Olson has been a part of more than 60 business entities and has more than 10 million dollars in investments. Doc. No. 40-3, p. 6, 44.

Bremer is a banking corporation and has its principal office and place of business in Saint Paul, Minnesota, with branch offices in Fargo, North Dakota. Doc. No. 1-3, ¶ 3. Vassil Zanev is a Bremer employee and currently the director of capital markets, and he has, throughout his time with Bremer, worked on swap agreements. Doc. No. 48-1, pp.17-18. Jennifer Carlier is another Bremer employee, who works with Zanev in the capital markets department and is currently the

---

[1] As alleged, 25th Street is the "survivor of a merger between 25th Street Group Apartments #1, LLC and 25th Street Group Apartments #2, LLC." Doc. No. 1-3, ¶ 2. 25th Street also alleges, and Bremer does not dispute, that while 25th Street's "cause of action arose before the merger was complete," 25th Street is qualified to bring claims as a successor-in-interest. For ease of reference, the Court will simply refer to the Plaintiff as 25th Street.

vice president capital markets associate. Doc. No. 48-2, p. 20. Jessica Broers is a business banker for Bremer and works on commercial loan requests. Doc. No. 24-1, p. 19. According to Broers, if a client is interested in a swap, she pulls in Zanev and Carlier and serves as a connection between the client and the "swap department." Doc. No. 28, p. 22. Broers also works on client relationships. Doc. No. 24-1, p. 19.

### A.    25th Street finances with Bremer

Broers has worked with both Jordahl and Olson on different financing transactions in the past. Doc. No. 28, pp. 23-24; Doc. No. 48, p. 27. In early 2017, Jordahl and Broers were working on separate financing unrelated to this case. See Doc. No. 48, p. 27. At the same time, 25th Street was seeking permanent financing to replace an existing construction loan. Doc. No. 42-3, p. 5. At some point, Jordahl and Broers discussed financing for 25th Street.[2] Doc. No. 48, p. 27. Broers represented that Bremer had "a fixed-rate product on a ten-year fixed," according to Olson. Id. Olson explained that this "seemed to be a good deal" so 25th Street "explored a fixed-rate loan with Bremer." Id.

25th Street ultimately decided to pursue financing with Bremer. When asked why, Jordahl explained, "[Olson] and I discussed it, so it was kind of a mutual thing. But [Olson] does a lot of this stuff. [Olson's] a real smart guy, kind of educated . . . he's the CPA guy[.]" Doc. No. 67, p. 7.

---

[2] According to Olson, Broers "solicited" 25th Street's business. Doc. No. 48, p. 27. Broers, on the other hand, testified that she did not remember who brought up the possibility of using a swap agreement first. Doc. No. 28, p. 38.

As part of this financing, 25th Street and Bremer entered into a loan agreement and a swap agreement on June 26, 2017.[3] Doc. Nos. 65-1, 65-2.

### 1. The Loan Agreement

The loan agreement consists of several documents—the loan, the note,[4] and collateral documents[5] (together, the "Loan Agreement"). See Doc. No. 65-1, p. 88. Under the Loan Agreement, Bremer agreed to make a single advance to 25th Street of $12,800,000. Id., p. 84. The interest rate under the Loan Agreement was a variable rate based on the ICE London Interbank Offered Rate ("LIBOR") plus 2.10%.[6] Id., p. 103. 25th Street, however, wanted a fixed interest rate. See Doc. No. 48, p. 32. To reach that end, 25th Street and Bremer created a synthetic fixed rate by entering into a swap agreement.

In entering into the swap agreement, Bremer wanted to ensure "the loan is structured exactly as the swap is," according to Zanev. Doc. No. 48-1, p. 31. Part of this process included having Bremer's "swap counsel do a review as well and make sure that everything related to the swap is included appropriately in the [Loan Agreement]." Id. Indeed, the Loan Agreement expressly contemplates the parties entering into a swap agreement. For example, under the Loan Agreement, a condition precedent to an initial monetary advance is "an independent ISDA swap

---

[3] According to James Lovely, a private consultant, 25th Street "in general viewed the swap and loan as an economic package" even though the loan agreement and swap agreement are "separate contracts." Doc. No. 42-2, pp. 20, 22. The loan agreement and swap agreement were both negotiated in North Dakota. Doc. No. 43, p. 14.

[4] The "note" is a promissory note payable to Bremer, containing the terms relating to the repayment, interest rate and other matters. Doc. No. 65-1, p. 84.

[5] The loan defines the "collateral documents" as "the Mortgage, Assignment and any other loan and collateral documents referred to in Section 3.1." Id., p. 83. In this case, the collateral for the Loan Agreement is located in North Dakota. Doc. No. 43, p. 14.

[6] The LIBOR is the "interest rate high-credit quality banks charge one another for short-term financing." Doc. No. 42-3, p. 10.

agreement executed by [25th Street], in form and substance satisfactory to [Bremer]." Doc. No. 65-1, p. 87 (emphasis added). The Loan Agreement also has a "Prepayment" clause, which provided, in part, that 25th Street "may prepay the Note, in whole or in part, at any time and from time to time without premium or penalty, subject to the terms and conditions of any independent ISDA swap agreement executed by [25th Street] of approximate even date herewith." Id., p. 85. Additionally, the Loan Agreement lists as an event of default, a "default under any interest rate swap . . . any time entered into by [25th Street] in connection with the Note[.]" Id., p. 96.

### 2.    The Swap Agreement

Similar to the Loan Agreement, the swap agreement consists of several documents—the 2002 ISDA Master Agreement (the "Master Agreement"), the schedule, and confirmations (together, the "Swap Agreement").[7] See Doc. No. 65-2, pp. 1, 16. Here, the Swap Agreement was for a 10-year interest rate swap, which created a synthetic fixed rate loan of 4.32% between the parties.[8] Doc. No. 42-3, p. 6.

Several provisions of the Swap Agreement are important to the competing motions. The Swap Agreement states, "This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)." Doc. No. 65-2,

---

[7] The Master Agreement is a standard form used by almost all derivative market participants. Doc. No. 42-3, p. 14. Instead, the "schedule is what is used to both complete and refine the terms of the ISDA Master Agreement." Doc. No. 42-2, p. 5. "Separately you have confirmations which are typically transaction specific documents." Id.

[8] Recall that under the Loan Agreement, 25th Street is paying Bremer a variable rate (one-month LIBOR plus 2.10%). Doc. No. 48-1, p. 21. Under the Swap Agreement, Bremer is now paying 25th Street the same variable rate (one-month LIBOR plus 2.10%). These payments, therefore, essentially cancel each other out. After this cancellation, the only payment left is 25th Street's payment to Bremer under the Swap Agreement, which is based on a fixed rate of 4.32%. The fixed rate of 4.32% is the average of the expected future one-month LIBOR plus the 2.10%, according to Zanev. Id., p. 22.

p. 34. Other relevant provisions concern the parties, the Loan Agreement, and termination. As to

the parties, the Swap Agreement states:

> [Each party] is acting for its own account, and it has made its own independent
> decisions to enter into that Transaction and as to whether that Transaction is
> appropriate or proper for it based upon its own judgment and upon advice from
> such advisers as it has deemed necessary. It is not relying on any communication
> (written or oral) of the other party as investment advice or as a recommendation to
> enter into that Transaction, it being understood that information and explanations
> related to the terms and conditions of a Transaction will not be considered
> investment advice or a recommendation to enter into that Transaction. No
> communication (written or oral) received from the other party will be deemed to be
> an assurance or guarantee as to the expected results of that Transaction.

Id., p. 35. The Swap Agreement further provides that "[t]he other party is not acting as a fiduciary

for or an adviser to it in respect of that Transaction." Id.

The Swap Agreement also contains provisions relating to the Loan Agreement. For

example, the Swap Agreement defines "Credit Agreement" as "that certain Loan Agreement, dated

June 26, 2017 [] among [Bremer] and [25th Street]."[9] Id., p. 31. The Swap Agreement also contains

an "Independent Obligations" provision, that states:

> Although [25th Street] may be entering into one or more Transactions under this
> Agreement to hedge against the interest expense of, or other risk associated with,
> an existing or future Loan, this Agreement and each Transaction shall be an
> independent obligation of [25th Street] separate and apart from any such Loan, and
> therefore: (A) each party's obligations under this Agreement or any Transaction
> shall not be contingent on whether any Loan closes, is outstanding or is repaid, in
> whole or in part, at any time; (B) except as expressly set forth in this Agreement,
> any repayment . . . of . . . any Loan, whether in whole or in part, at any time, shall
> not in any way affect this Agreement, any Transaction or either party's obligations
> under this Agreement or Transaction[.]

Id., p. 37.

---

[9] For consistency and readability, the Court will continue to refer to the June 26 loan as the "Loan
Agreement." Therefore, when the Swap Agreement refers to the "Credit Agreement," the Court
will substitute in brackets the phrase "Loan Agreement."

The Swap Agreement also has provisions relating to its termination. For example, the Swap Agreement lists six different "Additional Termination Events." See id., p. 31. One listed event is the "the payment in full of all loans, advances, indebtedness and other obligations of [25th Street] to [Bremer] and its Affiliates, other than obligations under this [Swap] Agreement (collectively, the "Loans"), or the prepayments of such Loans such that the aggregate outstanding principal amount of such Loans is less than the aggregate notional amount of the Transactions under [the Swap Agreement.]" Id.

If an Additional Termination Event occurs then a party may, under certain circumstances, give notice and designate an Early Termination Date. Id., p. 12. The amount, if any, payable in respect of that Early Termination Date is the Early Termination Amount. Id., p. 13. The calculation methodology for the Early Termination Amount depends on whether there is an event of default, a termination event, or a mid-market event, but each methodology relies on or references the Close-out Amount. See id., pp. 13-14. The Swap Agreement defines the Close-out Amount and contains specific provisions regarding how the Close-Out Amount is determined, among other things. See id., pp. 22-24.

## B.    Bremer's Hedge Swap with JP Morgan

Bremer managed its own risk under the Swap Agreement by entering into a separate interest-rate swap (the "Hedge Swap") with JP Morgan Chase Bank, National Association ("JP Morgan"). Doc. No. 42-3, p. 6; Doc. No. 42-2, p. 13 (According to Lovely, a hedge swap, while not essential, is a common tool banks use to manage risk.). The Hedge Swap was a mirror image of Bremer's Swap with 25th Street, according to Zanev. Doc. No. 48-1, p. 81. Namely, under the Hedge Swap, Bremer essentially paid JP Morgan a fixed interest rate of 4.32% of the notional

amount and, in return, JP Morgan paid Bremer a variable interest rate of one-month LIBOR plus 2.10% of the same notational amount. Doc. No. 42-3, p. 6.

### C.    Termination

In early 2020, 25th Street began to explore refinancing options. Id., p. 7. One option included seeking refinancing through the department of Housing and Urban Development ("HUD"). Id. To that end, while the HUD loan was being discussed Olson sent an email to Broers on February 25, 2020, asking, "Can you get me a prepay penalty on 25th buildings. I can't believe how low the 10 year has dropped." Doc. No. 48, pp. 62, 63. On February 26, 2020, Jenny Carlier emailed Olson and stated, "As of right now, the indicative termination amount for a full unwind of the interest rate swap is $870,000 due to Bremer Bank." Id., p. 64.

On March 11, 2020, 25th Street signed a loan commitment with Dwight Capital to refinance the Loan with a new, fixed-rate HUD loan that did not involve a swap and that would be secured by the same apartment buildings then securing the Loan. Doc. No. 48-3, p. 12. After entering into this loan commitment, 25th Street received a quarterly statement from Bremer showing the value of the swap, as was Bremer's typical practice. The April 1, 2020 quarterly statement provided that the "theoretical cost to termination the [Swap] transaction" was $1,339,698.68. Doc. No. 65-7, p. 27. This cost of termination, however, "made no sense" to Olson because he thought Bremer was valuing the swap with the 10-year treasury rate, not the LIBOR. Doc. No. 48, p. 59.

Nevertheless, 25th Street continued to pursue refinancing and scheduled the refinancing closing for mid-June 2020. Doc. No. 42-3, p. 7. As part of the refinancing, 25th Street requested a

payoff statement from Bremer on May 18, 2020.[10] Id. In response, Broers sent an email on May 19, 2020, providing the payoff amount and noting that the "indicative amount to fully terminate the swap is $1,385,000 due to Bremer Bank." Doc. No. 48, p. 80. Olson responded, "are you sure that prepay is accurate? We were quoted 1,339,699 on April 1 when the 10 year was 60 basis points. I would expect the prepay to be somewhere around 1.2 million today." Doc. No. 48-1, p. 116.

Broers forwarded Olson's email to Carlier and Zanev, asking if they could provide any insight into Olson's question. Doc. No. 65-10, p. 3. While both Carlier and Zanev responded to Olson, the parties focus on Zanev's response, which was as follows:

> the quarterly valuation we provided on 4/1 was based on rates as of end of business on 3/31. The 10 year treasury increased around 3 bps since 3/31. I have attached a scree[n] shot of the 10 year treasury rate history over the period for reference.
>
> Since there are approximately 7 years left on the swap, looking at rate changes at the 7 year point on the curve provides a better indication of changes in the swap value. We are also looking at the 7 year swap rate and not treasuries, since this is a LIBOR based swap. While market rates tend to move together and so treasuries can provide directionally an idea of where the swap value is heading, we can see swap and treasury rates diverge from each other. I have attached a chart comparing the 7 year US Treasury rate to the 7 year Swap rate since 3/31. While the treasury rate is relatively unchanged over the period, the 7 year swap rate has declined approximately 10 bps.
>
> When we are ready to unwind the swap, we will go to the market to get a termination value and we will pass that directly to you. Bremer only adds $2,000 to the termination costs to compensate us for direct expenses associated with the

---

[10] According to Carlier, Bremer cross collateralizes the loan with the swap. Doc. No. 48-2, p. 43. As such, in order for Bremer to release the collateral that's pledged for both the loan and the swap agreement, both the loan would have to be paid off and any swap termination fee would have to be paid. Doc. No. 48-2, p. 44. If a swap is not terminated than the personal guarantees that are provided in support of the swap agreement are not released and the collateral pledged in support for the swap agreement also is not released. Doc. No. 48-1, p. 111.

termination.[11] You should be able to reach out to any bank with swap capabilities and have them value the swap as of a specific date as well, and compare the valuation to the indication we have provided.

Doc. No. 40-13, p. 2. Jordahl represented that up until May 20, he and Olson thought the swap was based on the 10-year treasury. Doc. No. 67, p. 14.

       With the mid-June deadline for the refinancing approaching, Olson emailed Broers on June 4, disputing that the value of the swap termination and noting that 25th Street "will have to pay this off under dispute or whatever the legal language is that says we don't agree . . . but of course we will have to pay it off in order to get our HUD loan done." Doc. No. 48, p. 115. On June 5, 2020, Zanev emailed Alexander Fraser, an attorney for Bremer, with regards to swap agreements. Doc. No. 48-1, p. 108-109. That same day, Fraser responded and his response was forwarded to Olson. Id., pp. 109-110. The email from Fraser on June 5, 2020, provides, in pertinent part:

> [Zanev], you asked for me to confirm how a swap transaction should be valued for this transaction. As we've discussed, this depends on whether the termination is voluntary or forced as a result of a termination event such as the payoff of the related loan.
>
> - The customer does not have a right under these documents to require that the swap be terminated, and does not have any input at all on valuation of a terminated swap. Sometimes, a customer will request optional termination language to be included in the Schedule, but that language is not included here. Accordingly, the customer can request a voluntary termination, but the bank is not required to grant this request or adhere to any particular valuation. Of course, as you know, market convention is to grant this request at a market value, and I understand that you have provided this customer certain information about the current market value of the swap. But to be clear, you are not required to execute a voluntary termination at all, and if you do choose to accommodate such a request, you can choose the mechanism for how the swap is valued – like any other trade, this should be conducted on a recorded line where you will quote an unwind price to the customer and the customer can either accept or reject that price (and as a result, terminate, or not terminate at that value). The customer has not input

---

[11] The $2,000 is a direct expense that Bremer pays in connection with unwinding the transaction. Doc. No. 48-1, p. 152. Bremer, however, did not charge 25th Street the $2,000 in this case. Id.

on valuation for this purpose (other than choosing to terminate or not once you quote a live price).

- If the loan is paid off or refinanced, this will cause an Additional Termination Event under the Schedule. In that circumstance the bank will have the right, but not the obligation, to terminate the trade in accordance with very specific procedures outlined in the Master Agreement. An oversimplified version of those procedures is as follows:

  o The bank provides notice of its election to terminate to the customer in writing – typically the termination date is a couple business days after the notice, but that date is explicitly listed in the termination notice

  o On the termination date, the bank terminates the customer trade. The customer has no input on or right to contest the value of the termination. The value is determined according to the "Close-Out" method which is defined in the Master Agreement. Functionally, this is an indemnity method for banks that run back-to-back book, as you are permitted to charge the customer for your own cost of unwinding your market hedge, but you are also required to evaluate externally available pricing information – typically we obtain a couple of dealer quotes as a market check for our own unwind cost.[12] The cost to the customer is then (i) the Bank's unwind cost for its upstream hedge, <u>plus</u> (ii) any missed payments, <u>plus</u> (iii) legal fees incurred in connection with the termination.

  o Once the termination value is determined, a second notice is sent to the customer detailing the calculation of the termination amount.

Doc. No. 46-3.

---

[12] Here, Bremer did not obtain a couple of dealer quotes as a market check on the day of termination but did provide two dealer quotes to Bremer approximately six days prior to the termination date. Doc. No. 48-1, p. 113. To that end, Ryan McCamy emailed Mark Hanson on June 17, 2020 (six days prior to the June 23, 2020 termination date), stating "Mark, please see the attached written correspondence on behalf of Bremer. I would also like to add that Bremer reached out to a few dealers this morning on termination quotes and here are the results: Dealer 1 indicative termination amount of $1,365k valued at 9:54 a.m. C.T. Dealer 2 indicative termination amount of $1,267k valued at 10:43 a.m. CT. Bremer internal model showed indicative termination amount of $1,368k valued at 11:19 a.m. CT. Once you've had a chance to review the attached letter, give me a call." <u>Id.</u>, p. 138-39.

The parties do not dispute that the Swap Agreement was terminated on June 23, 2020. Doc. No. 65-16; see also Doc. No. 70-2 (a MarkitWire IRS Deal Tick with timestamps). 25th Street decided to terminate the loan and swap on June 23, 2020, so as to not delay refinancing. Doc. No. 42-3, p. 8. To that end, 25th Street represents that "without repayment of the Loan and payment of the Swap Termination Amount, the Loan's collateral and guaranties would not be released, and the Refinancing Loan could not close." Doc. No. 34, p. 11. This is consistent with the Pay-off letter, which provides that "Collateral securing the [the Note and Swap Agreement's termination amount] will not be released until [the Note and Swap Agreement's termination amount], including any obligations under the Swap Agreements, have been paid in full." Doc. No. 65-14. In this case, 25th Street paid Bremer $13,465,145.61—the principal balance of the loan ($12,013,046.32), the accrued interest ($6,099.29), and the estimated payoff of the swap termination ($1,446,000)—on June 23, 2020. Doc. No. 42-3, p. 8. The same day, the HUD refinancing closed. Doc. No. 1-3, ¶ 13. According to Olson, 25th Street would have to pay to terminate the Swap Agreement "in order to get our HUD loan done." Doc. No 40-3, p. 30.

According to Zanev, at the time of the termination, Carlier was on another call with the dealer bank terminating Bremer's hedge. Doc. No. 48-1, p. 89. When Carlier got price of $1,386,000 to terminate the hedge swap, she provided that amount to Zanev, who in turn gave that amount to Olson. Id. Ultimately the termination of the swap was valued at Bremer's cost to terminate the hedge swap at $1,386,000.  Doc. No. 42-3, p. 8. This case followed.

### D.    Procedural Posture

25th Street originally filed this action in state court in early August of 2020, and Bremer filed its notice of removal on September 4, 2020. Doc. No. 1. On September 2, 2021, 25th Street filed a motion for partial summary judgment as to three claims: breach of contract (count I),

negligent misrepresentation (count IV), and breach of covenant of good faith and fair dealing (count V). Doc. No. 33. On September 3, 2021, Bremer filed a separate motion for summary judgment as to each of 25th Street's seven claims: breach of contract (count I); declaratory judgment (count II); unlawful sales or advertising practices (count III); negligent misrepresentation (count IV); breach of the covenant of good faith and fair dealing (count V); breach of fiduciary duty (count VI); and unjust enrichment (count VII). Doc. No. 38.

## II.   <u>LAW AND ANALYSIS</u>

Before diving into the merits of the summary judgment motions, the Court must first address the threshold issue of whether to apply North Dakota law or New York law to 25th Street's claims in this case.

### A.   Choice of Law

"Because this Court is sitting in diversity jurisdiction, North Dakota choice-of-law rules apply in this case." <u>N. Bottling Co. v. PepsiCo, Inc.</u>, 427 F. Supp. 3d 1106, 1117 (D.N.D. 2019), <u>aff'd</u>, 5 F.4th 917 (8th Cir. 2021) (citing <u>Chapman v. Hiland Partners GP Holdings, LLC</u>, 862 F.3d 1103, 1108 (8th Cir. 2017)). In applying North Dakota choice of law rules, the Court will first address 25th Street's claims sounding in contract, then its claims that arise in tort.

### 1.   25th Street's Contract Claims

As to 25th Street's contract claims, "North Dakota courts honor contractual choice-of-law provisions with respect to questions of interpretation or construction of a contract unless doing so would violate a fundamental public policy of North Dakota." <u>Id.</u> (citing <u>Chapman</u>, 862 F.3d at 1108; <u>John T. Jones Constr. Co. v. Hoot Gen. Constr. Co.</u>, 613 F.3d 778, 782-83 (8th Cir. 2010)). Here, the choice of law provision in the Swap Agreement states, "This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to

choice of law doctrine).” Doc. No. 65-2, p. 34. Notably, neither party appears to dispute that New

York law governs the breach of contract claims.[13] See Doc. No. 38-1, p. 11; Doc. No. 43, p. 12.

Additionally, neither party has asserted that the provision violates any fundamental public policy

of North Dakota. As such, New York law governs the interpretation of the Swap Agreement.

### 2. 25th Street's Tort Claims

The parties do disagree on whether 25th Street's tort claims are governed by North Dakota

or New York law, though the specific choice of law analysis from both parties is minimal. As to

tort claims, when applying North Dakota choice of law rules:

> In determining which state law applies, North Dakota courts employ the "significant contacts test." Id.; see Daley v. American States Preferred Ins. Co., 587 N.W.2d 159, 161 (N.D. 1998). "The significant contacts test authorizes a court to look at all of the significant factors which might logically influence it in deciding which law to apply and choose the law of the state that has the greatest contacts with the case." Daley, 587 N.W.2d at 161. The specific contacts to be considered in tort cases are:
>
>> the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, nationality, residence, place of business, or place of incorporation of the parties; and the place where the relationship, if any, between the parties is centered.

N. Bottling Co., 427 F. Supp. 3d at 1117. Additionally,

> To supplement the significant contacts test, North Dakota has approved the use of the choice-influencing considerations first enunciated by Robert A. Leflar, Choice-Influencing Considerations in Conflicts Law, 41 N.Y.U.L.Rev. 267, 282 (1966). Id. These five choice-influencing factors are: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. Id.

---

[13] The Loan Agreement has a choice of law provision, which provides that the "loan" shall be governed by the laws of the State of North Dakota. Doc. No. 65-1, p. 98.

> With the adoption of Leflar's choice-influencing factors, North Dakota's significant contacts test becomes something of a hybrid, resulting in a two-pronged analysis. <u>Daley v. Am. States Preferred Ins. Co</u>, 587 N.W.2d 159, 162 (N.D. 1998). First, a court is to make a determination of all of the relevant contacts that might logically influence the decision of which law to apply. Second, Leflar's choice-influencing factors are applied to determine which jurisdiction has the more significant interest with the issues in the case. <u>Id.</u>

<u>Mitchell v. DynCorp Int'l, LLC</u>, No. 3:11-CV-90, 2012 WL 12860119, at *6-7 (D.N.D. June 21, 2012).

Here, 25th Street is a North Dakota limited liability company and has its principal office in Fargo, North Dakota. While Bremer has its principal office and place of business in Saint Paul, Minnesota, it has branch offices in Fargo, North Dakota. Doc. No. 1-3, ¶ 3. Indeed, the Loan Agreement and Swap Agreement were negotiated in North Dakota. Doc. No. 43, p. 14. And the collateral for the Loan Agreement is also located in North Dakota. <u>Id.</u> Moreover, 25th Street alleges (and Bremer does not appear to dispute) that "[t]here is no contact that occurred in, or arose from, New York." <u>Id.</u>, p. 15. As such, the Court will apply North Dakota law to 25th Street's tort claims.

### B.  Summary Judgment Standards

With the choice of law issues resolved, the Court moves to the summary judgment motions. "A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Id.</u>; <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." <u>Schilf v. Eli Lilly & Co.</u>, 687 F.3d 947, 948 (8th Cir. 2012) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" <u>Dick v. Dickinson State Univ.</u>, 826

F.3d 1054, 1061 (8th Cir. 2016) (quoting <u>Anderson</u>, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." <u>TCF Nat'l Bank v. Mkt. Intelligence, Inc.</u>, 812 F.3d 701, 707 (8th Cir. 2016) (quoting <u>Johnson v. Securitas Sec. Servs. USA, Inc.</u>, 769 F.3d 605, 611 (8th Cir. 2014)).

"When both parties move for summary judgment, the Court must analyze each motion individually and on its own merits." <u>Wade v. Acct. Resol. Corp.</u>, No. 4:15-CV-1354 JAR, 2017 WL 1958433, at *1 (E.D. Mo. May 10, 2017) (citing <u>Wermager v. Cormorant Township Bd.</u>, 716 F.2d 1211, 1214 (8th Cir. 1983)). As such, the traditional approach "is only slightly modified." <u>Avon State Bank v. BancInsure, Inc.</u>, No. CIV. 12-2557 RHK/LIB, 2014 WL 1048503, at *4 (D. Minn. Mar. 18, 2014), <u>amended in part,</u> No. CIV. 12-2557 RHK/LIB, 2014 WL 1608262 (D. Minn. Apr. 18, 2014), <u>order amended and superseded,</u> No. 12-2557 (RHK/LIB), 2014 WL 11516522 (D. Minn. Apr. 21, 2014), and <u>aff'd in part,</u> 787 F.3d 952 (8th Cir. 2015), and <u>aff'd,</u> 787 F.3d 952 (8th Cir. 2015). When considering 25th Street's motion, the Court views the record in the light most favorable to Bremer, and when considering Bremer's motion, the Court views the record in the light most favorable to 25th Street. <u>See id.</u> "Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." <u>Seaworth v. Messerli</u>, Civ. No. 09–3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010), <u>aff'd</u>, 414 F. App'x 882 (8th Cir. 2011) (per curiam)).

"At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." <u>Nunn v. Noodles & Co.</u>, 674 F.3d 910, 914 (8th Cir. 2012) (citing <u>Anderson</u>, 477 U.S. at 249). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward

with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). "However, if a plaintiff cannot support each element of its claim, summary judgment must be granted, because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial." Cousineau v. Norstan, Inc., No. 00-1113 DSD/JGL, 2001 WL 1640118, at *3 (D. Minn. July 26, 2001), aff'd, 322 F.3d 493 (8th Cir. 2003) (citing Celotex, 477 U.S. at 322-23). Rule 56 requires a proper summary judgment motion to be opposed by the kinds of evidentiary materials listed in Rule 56(c), such as depositions, documents, affidavits or declarations, stipulations, admissions, and interrogatory answers. See Celotex, 477 U.S. at 324.

C.    **Discussion and Analysis**

Here, both 25th Street and Bremer moved for summary judgment as to the breach of contract claim (count I), the breach of covenant of good faith and fair dealing claim (count V), and the negligent misrepresentation claim (count IV). See Doc. Nos. 33, 38-1. The Court will address each in turn then analyze the four claims on which only Bremer moved for summary judgment: declaratory judgment (count II), breach of fiduciary duty (count VI), unlawful sales or advertising practices (count III), and unjust enrichment (count VII).

1.    **Breach of Contract (count I)**

Both parties request summary judgment on 25th Street's breach of contract claim. Under New York law, the elements of a breach of contract claim are: "(1) the existence of a contract, (2) the plaintiff's performance, (3) the defendant's breach, and (4) resulting damages." Alloy Advisory, LLC v. 503 W. 33rd St. Assocs., Inc., 195 A.D.3d 436, 436, 144 N.Y.S.3d 854 (N.Y. 2021). As well-stated by the United States District Court for the Southern District of New York:

In determining a party's obligations under a contract, "the initial interpretation of a contract is a matter of law for the court to decide." K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996) (citation omitted).

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157–58 (2d Cir. 2000) (citing Mellon Bank, N.A. v. United Bank Corp. of N.Y., 31 F.3d 113, 115 (2d Cir. 1994)). "[T]he presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence." Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 236 (2d Cir. 2008) (citation omitted). Thus, if the "resolution of the ambiguity hinges on such extrinsic matters as the credibility of witnesses or documents or upon choosing one among several reasonable inferences that may be drawn from such extrinsic evidence, a jury, and not a court, should decide what meaning is to be ascribed to the contract." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 148–49 (2d Cir. 1993) (citations omitted). However, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view 'strain[s] the contract language beyond its reasonable and ordinary meaning.'" Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) (quoting Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957)).

MBIA Ins. Corp. v. Coop. Centrale Raiffeisen-Boerenleenbank B.A., No. 09 CIV. 10093 RJS, 2011 WL 1197634, at *6 (S.D.N.Y. Mar. 25, 2011). "'Contract language is unambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" U.S. Bank Nat. Ass'n v. Ables & Hall Builders, 696 F. Supp. 2d 428, 440 (S.D.N.Y. 2010) (quoting Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir.1990)). "In interpreting a contract under New York law, words and phrases ... should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." Citibank, N.A. v. Morgan Stanley & Co. Int'l, PLC, 724 F. Supp. 2d 398, 404 (S.D.N.Y. 2010), aff'd, 482 F. App'x 662 (2d Cir. 2012), as amended (Oct. 25, 2012) (internal citations and quotations omitted).

With this framework in mind, the Court notes as an initial matter that neither party disputes the second element for a breach of contract claim, that 25th Street preformed under the contract, is satisfied. See Doc. No. 38-1. Similarly, as to the fourth element, resulting damages, 25th Street acknowledges that calculation of any alleged damages would not be appropriate at this stage of the proceedings, based on the facts of this case. See Doc. No. 34, p. 18. And, as 25th Street and Bremer only engage in limited (if any) analysis as to the fourth element, the Court will only address it to the extent necessary. Accordingly, the Court will focus its analysis on the two remaining elements: existence of a contract and the alleged breach.

### i.      Existence of a Contract

As to the first element, the existence of a contract, Bremer and 25th Street concur that a contract exists[14] but disagree as to which agreements form the contract at issue. See Doc. No. 43, p. 17. For example, Bremer adopts a narrow view of the contract, arguing that for the purposes of the breach of contract claim, its relationship with 25th Street "is governed by the Master Agreement, the Schedule, and the Confirmation." Doc. No. 38-1, p. 10; see also Doc. No. 42, p. 2 (arguing that the Loan and Swap are two sperate and distinct contracts with "different obligations"). Conversely, 25th Street posits a more expansive view, arguing that the contract consists of several agreements: the Master Agreement, schedule, swap confirmation, the "course and performance between Bremer and 25th Street," "the documents Bremer provided to 25th Street as part of the swap," "the representations Bremer made to 25th Street further explaining how this swap would be terminated, including its value at termination," and "the agreements subsequent to those documents, including the non-wavier and reservation of rights agreement in the Pay Off

---

[14] See Doc. No. 34, pp. 17-18 (25th Street asserts the "parties do not dispute that the Swap was a contract."); Doc. No. 38-1, p. 12 (where Bremer notes "there is no dispute about the existence of a contract").

letter." Doc. No. 43, pp. 3-4. Unfortunately, neither party cited any law to support their competing propositions.[15]

Nevertheless, the core dispute between the parties in the breach of contract claim is a dispute over the pay off, or Close-Out Amount (a defined term in the Swap Agreement), to terminate the Swap Agreement. So, in determining which agreement is the operative contract for the breach of contract claim, the Court looks first to the plain language of the Swap Agreement. To that end, under the plain and unambiguous language of the Swap Agreement, the Loan Agreement and Swap Agreement are separate contracts. For example, the Swap Agreement defines a "Credit Agreement" as "that certain Loan Agreement, dated June 26, 2017 [] among [Bremer] and [25th Street]." Doc. No. 65-2, p. 31. Keeping in mind that the Swap Agreement has specifically defined the Loan Agreement, the term is notably absent from the "Single Agreement" clause which provides, in part, that "this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this 'Agreement')[.]" Id., p. 1. Most persuasive, however, is the "Independent Obligations" provision, which provides:

> Although [25th Street] may be entering into one or more Transactions under this Agreement to hedge against the interest expense of, or other risk associated with, an existing or future Loan, this Agreement and each Transaction shall be an independent obligation of [25th Street] separate and apart from any such Loan, and therefore: (A) each party's obligations under this Agreement or any Transaction shall not be contingent on whether any Loan closes, is outstanding or is repaid, in whole or in part, at any time; (B) except as expressly set forth in this Agreement, any repayment . . . of . . . any Loan, whether in whole or in part, at any time, shall not in any way affect this Agreement, any Transaction or either party's obligations under this Agreement or Transaction[.]

---

[15] The Court notes that both the Swap Agreement and Loan have different choice of law provisions. The choice of law provision in the Swap Agreement provides that it is governed by the law of the State of New York. Doc. No. 65-2, p. 34. On the other hand, the choice of law provision in the Loan Agreement, however, provides that it is governed by the laws of the State of North Dakota. Doc. No. 65-1, p. 98. The Court will use New York law to consider whether the terms of the Swap Agreement are ambiguous as to what documents form the contract between 25th Street and Bremer.

Id., p. 37. Accordingly, the Court finds that the plain and unambiguous language of the Swap Agreement shows that the Loan Agreement and Swap Agreement are separate contracts. Therefore, as to the breach of contract claim, the operative and controlling contract is the Swap Agreement, which is comprised of the Master Agreement, schedule, and confirmations.

### ii.     Breach

With the question of which contract controls resolved, the next issue is the alleged breach of the Swap Agreement. 25th Street argues that Bremer breached the contract "by failing to meet its duty to 'use commercially reasonable procedures in order to produce a commercially reasonable result' during the calculation of the Close-Out Amount." Doc. No. 34, p. 18. Bremer raises two counterpoints: (1) that 25th Street requested a voluntary termination, and (2) Bremer was not required to apply the "Close-Out Amount" to a voluntary termination but did so anyways.  Doc. No. 42, p. 17.

Before the Court can address the Close-Out Amount, it must first address the threshold issue of whether there was an Additional Termination Event, as defined under the Swap Agreement. Both parties agree that under the terms of the Swap Agreement, if there was an "Additional Termination Event[,]" then Bremer would be contractually obligated to compute the Close-Out Amount using the methodology set forth in the Swap Agreement. See Doc. No. 51, p. 7; Doc. No. 38-1, p. 12. And, neither party disputes that 25th Street requested a voluntary termination of the Swap. See Doc. No. 42, p. 17; Doc. No. 43, p. 18. Rather, the issue is whether 25th Street's voluntary termination qualifies as an "Additional Termination Event" as defined under the Swap Agreement.

To that end, the Swap Agreement lists six different events that qualify as an Additional Termination Event. See Doc. No. 65-2, p. 31. One such event is the "the payment in full of all

loans, advances, indebtedness and other obligations of [25th Street] to [Bremer] and its Affiliates, other than obligations under this [Swap] Agreement (collectively, the "Loans"), or the prepayments of such Loans such that the aggregate outstanding principal amount of such Loans is less than the aggregate notional amount of the Transactions under [the Swap Agreement.]" Id. 25th Street asserts that pursuant to this language, its "voluntary prepayment" of the Loan is an Additional Termination Event. Doc. No. 43, p. 19. Bremer disputes that interpretation and views 25th Street's payment as a voluntary termination of the Swap Agreement, which did not trigger the Close-out valuation methodology in the Swap Agreement.

The parties' respective framing of this issue highlights the critical and material question of fact necessary to resolve this issue. A fact finder must make a credibility and fact determination as to whether 25th Street's payment was a "prepayment," as that is understood in the definition of an Additional Termination Event, or if it was simply a voluntary termination of the Swap Agreement in order to obtain refinancing with HUD. Answering this question requires assessing credibility and facts – 25th Street's view is that its approach to Bremer to "prepay" the Loan triggered an Additional Termination Event, but Bremer's view is that 25th Street approached Bremer to voluntarily terminate the Swap Agreement to pursue other financing options for the Loan.

Additionally and relatedly, there is a genuine issue of material fact as to whether 25th Street's payment occurred before or after the Swap Agreement was terminated. If the voluntary prepayment occurred before the Swap Agreement was terminated, then it would seem that under the plain and unambiguous language of the Swap Agreement, an Additional Termination Event occurred.  See BDC Fin. L.L.C. v. Barclays Bank PLC, 25 N.Y.3d 37, 43 (N.Y. 2015). However, if an Additional Termination Event occurs, then several other steps and rights under the Swap Agreement are triggered (notably, none of which appear to have occurred here); an Additional

Termination Event does not in and of itself terminate the Swap Agreement. On the other hand, consider a situation where the parties agreed that the Swap Agreement would be terminated <u>before</u> prepayment, which is arguably Bremer's view. In that situation, whether voluntary prepayment is an Additional Termination Event under the Swap Agreement does not matter because the Swap Agreement is terminated and no longer in effect.

The issue of whether the parties agreed to voluntarily terminate the Swap Agreement or whether 25th Street made a voluntary prepayment to trigger an Additional Termination Event presents as a classic "which came first" question. However, based on the record currently before the Court, the Court cannot say there are no genuine issues of material fact as to the breach of contact claim. Resolving that question requires a fact finder to weigh the testimony and evidence and make a factual determination. As a result, because a genuine issue of material fact exists as to the breach of contract claim, the Court denies both motions for summary judgment on that claim.

### 2.  Breach of Covenant of Good Faith and Fair Dealing (count V)

Next, 25th Street next alleges that Bremer breached the covenant of good faith and fair dealing. <u>See</u> Doc. No. 34, pp. 23-25. The Eighth Circuit has recently explained:

> "[U]nder New York law, every contract contains an implied covenant of good faith and fair dealing," and the duty to exercise good faith and fair dealing can be rooted in both New York common law and the UCC. <u>Arbitron Inc. v. Tralyn Broad., Inc.</u>, 526 F. Supp. 441, 447–48 (S.D.N.Y. 2007). "New York courts have repeatedly affirmed that a party may be in breach of an implied duty of good faith and fair dealing, even if it is not in breach of its express contractual obligations, when it ... deprive[s] the other party of the fruit of its bargain." <u>Duration Mun. Fund, L.P. v. J.P. Morgan Sec. Inc.</u>, 2009 WL 2999201, at *6 (N.Y. Sup. Ct. Sept. 16, 2009) (unpublished). But, "[a] claim of implied duty of good faith and fair dealing cannot create new duties under a contract or substitute for an insufficient contract claim." <u>Duration</u>, 2009 WL 2999201, at *7; <u>accord</u> <u>Lehman Bros. Int'l (Europe) v. AG Fin. Prod., Inc.</u>, 2013 WL 1092888, *2 (N.Y. Sup. Ct. Mar. 12, 2013) (unpublished) ("[T]he covenant of good faith and fair dealing cannot be construed so broadly as to effectively nullify other express terms of the contract, or to create independent contractual rights." (citation omitted)).

> A claim for the breach of the covenant of good faith and fair dealing is not "a substitute for a nonviable breach of contract claim." <u>Triton Partners LLC v. Prudential Sec. Inc.</u>, 301 A.D.2d 411, 752 N.Y.S.2d 870, 870 (2003). "[T]he implied covenant of good faith and fair dealing only precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." <u>Arbitron</u>, 526 F. Supp. 2d at 448 (alteration in original) (quotation omitted). The covenant "merely brings to light implicit duties to act in good faith already contained, although not [ ] specified in the contract. ... [F]or the implied duty of good faith and fair dealing to stand as a cause of action, there must be an underlying contractual obligation between the parties." <u>Duration</u>, 2009 WL 2999201, at *7.

<u>N. Bottling Co.</u>, 5 F.4th at 923-24. Importantly, "an implied covenant claim "will not stand if it is duplicative of a breach of contract claim." <u>Negrete v. Citibank, N.A.</u>, 237 F. Supp. 3d 112, 130 (S.D.N.Y. 2017), <u>aff'd</u>, 759 F. App'x 42 (2d Cir. 2019). <u>See also</u> <u>Lehman Bros. Int'l (Eur.) v. AG Fin. Prod., Inc.</u>, 969 N.Y.S.2d 804 (Sup. Ct. 2013) ("A cause of action for breach of the implied covenant will be dismissed as duplicative of a breach of contract cause of action where both claims arise from the same facts and seek identical damages." (internal citation omitted)).

Here, 25th Street's allegations of the breach of contract and implied covenant causes of action overlap in significant respects. First, looking to the language of the complaint, under the breach of contract cause of action, 25th Street alleges that "Bremer breached the contract(s) by charging [25th Street] an incorrect, inflated Early Termination Amount." Doc. No. 1-3, ¶ 16. For its breach of the covenant of good faith and fair dealing claim, 25th Street makes a nearly identical assertion—that "Bremer breached its covenant of good faith and fair dealing by charging [25th Street] an incorrect, inflated Early Termination Amount." <u>Id.</u> ¶ 36. Because an implied covenant claim "will not stand if it is duplicative of a breach of contract claim," the Court dismisses 25th Street's breach of the implied covenant of good faith and fair dealing cause of action.

### 3.    Negligent Misrepresentation (count IV)

Both 25th Street and Bremer move for summary judgment on 25th Street's negligent misrepresentation (count IV) under North Dakota Century Code section 9-03-08(2).[16] Doc. No. 1-3, p. 5.  That statute states, in relevant part:

> Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with the party's connivance, with intent to deceive another party thereto or to induce the other party to enter into the contract:
>
> * * *
>
> 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though that person believes it to be true[.]

N.D. Cent. Code § 9-03-08. When analyzing section 09-03-08, the United States Court of Appeals for the Eighth Circuit explained:

> Subsection 2, unlike the other enumerated acts of actual fraud, eliminates "intent" as a necessary element and as interpreted by the court in Bourgois indicates that a claim of fraud may be actionable on the basis of mere negligence of representation. However, because a plaintiff claiming fraud must also demonstrate that the acts were committed "with intent to deceive another party thereto or to induce him to enter into the contract," a successfully raised negligent misrepresentation claim must also allege that the misrepresentation occurred in the context of a contractual inducement.

> The "inducement to contract" requirement logically applies because the alternative, "with intent to deceive another" (set apart by the disjunctive "or"), does not require "inducement," but does require "intent." As negligent conduct is conduct that lacks intent, the fraud statute seems to suggest that negligent misrepresentation could only occur in a contractual context. In other words, the most reasonable

---

[16] Bremer's opening argument as to negligent misrepresentation and unlawful sales or advertising practices (count II) is that 25th Street failed to plead these fraud claims with sufficient particularity under Federal Rule of Civil Procedure 9(b).  Notably, Bremer raises this argument for the first time in its motion for summary judgment. Doc. No. 38-1, p. 18. 25th Street noted that a Rule 56 motion for summary judgment is not the proper vehicle to raise a Rule 9(b) particularity challenge. See Doc. No. 43, pp. 25-26. While there is no direct authority resolving that issue, the case law appears to suggest a Rule 9(b) challenge is untimely when raised in a summary judgment motion. 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1300 (4th ed.). So, without expressly deciding that open legal question, the Court will proceed to deciding the motion under Federal Rule of Civil Procedure 56.

interpretation of the bifurcated clause, "with intent to deceive another party thereto or to induce him to enter into the contract," suggests that negligent misrepresentation attaches to the latter, intentional fraud to the former. This was the conclusion reached by the district court, see Cooperative Power Ass'n v. Westinghouse Elec. Corp., No. A1–90–150, at 4–7 (D.N.D. Sept. 26, 1994) (Memorandum and Order), and one strongly suggested by the court in Bourgois, 466 N.W.2d at 817–18 (characterizing negligent fraud claims as only arising in the context of contractual inducements).

Coop. Power Ass'n v. Westinghouse Elec. Corp., 60 F.3d 1336, 1342 (8th Cir. 1995) (emphasis in original). In other words, a negligent misrepresentation claim made under North Dakota Century Code section 9-03-08(2), which is the precise claim brought by 25th Street here, "relates to a misrepresentation that allegedly induced one party to enter the contract or at least a misrepresentation in a contractual setting." Id. at 1343 (emphasis added).

25th Street posits that North Dakota courts have clarified that this section can also apply if the fraudulent inducement occurs after the parties have entered into a contract, if one party detrimentally alters its position. However, the plain language of section 9-03-08(2) and the case law appear to belie that argument. See N.D. Cent. Code § 9-03-08(2); Westinghouse Elec. Corp., 60 F.3d at 1342. 25th Street alleges several misrepresentations by Bremer occurring around the termination of the Swap Agreement, including valuation statements and misrepresentations as to the valuation of the swap at termination. See Doc. No. 43, p. 31-34. But there is no dispute that the alleged misrepresentations at issue were not made to induce 25th Street to enter into the Loan Agreement and Swap Agreement, but rather concern the valuation of the swap after 25th Street decided to seek refinancing. Moreover, the facts further belie any argument as to detrimentally altering its position–there is no dispute in the record that 25th Street was the party who sought refinancing and set in motion a sequence of events that ultimately led to the termination of the Swap Agreement (and the resulting dispute over the terms of the Early Termination Amount). 25th Street intended to refinance; the operative question, then, became how much it would cost. There

was no inducement or detrimental alteration in position. The record is clear that this is not a situation where Bremer made certain misrepresentations to 25th Street, which then caused 25th Street to enter into or detrimentally alter its position in the Swap Agreement.

Stated simply, on this record, there are no alleged misrepresentations by Bremer that induced 25th Street to enter a contract or detrimentally alter its position as to that contract. Accordingly, the Court finds that 25th Street's negligent misrepresentation claim (count IV) fails as a matter of law. The Court denies 25th Street's motion for summary judgment as to that claim, grants Bremer's motion for summary judgment, and dismisses the negligent misrepresentation claim (count IV) from the complaint.

### 4.   Declaratory Judgment (count II)

With the cross motions for summary judgment resolved, the Court turns to the remaining claims to which only Bremer moved for summary judgment. First, Bremer moves for summary judgment on 25th Street's declaratory judgment claim. Under this claim, 25th Street requests that the Court determine both "the terms and value of the parties' agreements" and the "proper calculation for an Early Termination Amount owed to Bremer under the Swap." Doc. No. 1-3, p. 4. Bremer argues that "no calculation of an Early Termination Amount is warranted under the plain terms of the Schedule to the 2002 Master Agreement as no 'Additional Termination Event' occurred." Doc. No. 38-1, p. 16.

For the reasons stated above, there are genuine issues of material fact regarding the voluntary termination of the Swap Agreement that preclude the Court from granting summary judgment on this claim. As such, summary judgment on this claim is not appropriate and is denied.

### 5.      Breach of Fiduciary Duty (count VI)

Next, Bremer moves for summary judgment on 25th Street's breach of fiduciary duty claim. As to this claim, 25th Street alleges that Bremer "owed a fiduciary duty to [25th Street] and the duties of care, good faith, and transparency in regard to Bremer's communications to [25th Street], including, but not limited to, the valuation of the Swap and the calculation of the Early Termination Amount." Doc. No. 1-3, p. 6. 25th Street argues that Bremer breached these duties by charging it an "incorrect, inflated Early Termination Amount." Id.

Under North Dakota law,[17] "[i]n order to establish a breach of a fiduciary duty, the plaintiff must prove: (1) a fiduciary relationship between the plaintiff and defendant, (2) a duty by the defendant to the plaintiffs arising from that relationship, (3) the defendant's breach of that duty, and (4) damage to the plaintiffs proximately caused by that breach of duty.'" Matter of Est. of Vendsel, 2017 ND 71, ¶ 14, 891 N.W.2d 750 (internal citation and quotation omitted) (cleaned up). At issue here is the first element, whether there was a fiduciary relationship between 25th Street and Bremer.

"The existence and scope of a fiduciary duty depends upon the language of the parties' agreement." Grynberg v. Dome Petroleum Corp., 1999 ND 167, ¶ 21, 599 N.W.2d 261 (internal citation omitted). Bremer argues that 25th Street's claim for breach of fiduciary duty should be dismissed because, among other things, the parties expressly agreed in the Swap Agreement that no fiduciary duty existed and "banks do not owe customers fiduciary duties under the circumstances like those described in the Complaint." Doc. No. 38-1, p. 23. The Court agrees.

---

[17] 25th Street asserts that because "[b]oth New York and North Dakota law consider a breach of fiduciary duty to be a tort" the Court should analyze this claim under North Dakota law. Doc. No. 43, p. 38. While Bremer cites both North Dakota and New York law to support its arguments, see Doc. No. 54, p. 8, it does not appear to dispute that the Court should apply North Dakota law when analyzing this claim. For this reason, among others, the Court will apply North Dakota law.

The Court notes as an initial matter that Jordahl and Olson, as members of 25th Street, both executed the Swap Agreement on June 26, 2017. Doc. No. 65-2, p. 44. That same day, a representative of Bremer also executed the Swap Agreement. <u>Id.</u> The Swap Agreement states:

> [Each party] is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction, it being understood that information and explanations related to the terms and conditions of a Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

<u>Id.</u>, p. 35. Importantly, the Swap Agreement further provides that "[t]he other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction." <u>Id.</u> The Court finds that the plain of these provisions are unambiguous and do not support 25th Street's contention that a separate and distinct fiduciary relationship existed.

Even beyond the plain language of the Swap Agreement, the circumstances in this case do not give rise to a fiduciary relationship between 25th Street and Bremer. 25th Street argues that Bremer made "representations" (such as its calculation of the Swap termination amount and advising that 25th Street had no input in the Swap termination) that were "Bremer's invitation that 25th Street could—or must—place its confidence and trust in Bremer as Bremer handled the Swap termination." Doc. No. 43, p. 39. The Court disagrees.

As well stated by the North Dakota Supreme Court:

> [¶16] "The relationship between a bank and its customers is viewed as a debtor-creditor relationship which does not ordinarily impose a fiduciary duty upon a bank." <u>Union State Bank v. Woell</u>, 434 N.W.2d 712, 721 (N.D. 1989). "Some courts have recognized that a fiduciary relationship may arise under circumstances which reflect a borrower's reposing of faith, confidence and trust in a bank with a resulting domination, control or influence exercised by the bank over the borrower's affairs." <u>Id.</u> In those circumstances, "the borrower or party reposing the

confidence must be in a position of inequality, dependence, weakness, or lack of knowledge. <u>Id.</u> However, "[i]n a commercial context, the mere rendering of advice by a lender to a borrower, even if given in a sincere effort to help the borrower prosper, does not transform a business relationship into a fiduciary relationship." <u>Id.</u> "Rather, actual day-to-day involvement in management and operations of the borrower or the ability to compel the borrower to engage in unusual transactions is required for the purposes of showing that a lending institution had 'control over a borrower.'" <u>Id.</u> The existence of a fiduciary relationship is a question of fact which is dependent upon a showing of special circumstances. <u>First Nat'l Bank & Trust Co. v. Brakken</u>, 468 N.W.2d 633, 637 (N.D. 1991).

<u>Baker Boyer Nat'l Bank v. JPF Enterprises, LLC</u>, 2019 ND 76, ¶ 16, 924 N.W.2d 381. Here, the undisputed facts show that 25th Street was not in a position of "inequality, dependence, weakness, or lack of knowledge." <u>Id.</u> ¶ 19. Indeed, quite the contrary. It is undisputed that Olson and Jordahl were savvy and sophisticated businesspeople. By way of example, Olson is a certified public accountant with an active license. Doc. No. 48, p. 17. Additionally, Olson has more than $10 million in investments and testified that he has likely been a part of more than 60 business entities. Doc. No. 40-3, p. 6, 44. Likewise, Jordahl has more than $10 million dollars in investments, which include, among other things, investing in farmland and buying and developing land with apartment buildings or rental properties. Doc. No. 67, pp. 6, 9. Jordahl is also involved in "a number of different entities," about half of which include Olson. <u>Id.</u>, p. 6. One of Olson and Jordahl's mutual business entities, West 29, enter into and terminated a different swap agreement with Bremer. Doc. No. 48, pp. 2, 22. As such, even viewing the facts in the light most favorable to 25th Street, the undisputed facts show that 25th Street was not in a position of "inequality, dependence, weakness, or lack of knowledge." <u>Baker Boyer Nat'l Bank</u>, 2019 ND 76, ¶ 19.

Additionally, 25th Street has failed to present specific evidence to raise a factual issue regarding whether Bremer assumed anything more than an ordinary lender-borrower relationship. Indeed, 25th Street entered into a lender-borrower relationship because it was seeking permanent financing to replace an existing construction loan. Doc. No. 42-3, p. 5. Broers has worked with

both Jordahl and Olson on different financing transactions in the past. Doc. No. 28, pp. 23-24; Doc. No. 48, p. 27. In early 2017, Jordahl and Broers were working on financing unrelated to this case, and at the same time, 25th Street was seeking permanent financing to replace an existing construction loan. Doc. No. 42-3, p. 5; see Doc. No. 48, p. 27. At some point, Jordahl and Broers discussed financing for 25th Street. While Olson claims that Broers "solicited" 25th Street's business, he also claimed that the financing "seemed to be a good deal." Doc. No. 48, p. 27. Moreover, when Jordahl was asked why 25th Street ultimately decided to pursue financing with Bremer, Jordahl explained, "[Olson] and I discussed it, so it was kind of a mutual thing. But [Olson] does a lot of this stuff. [Olson's] a real smart guy, kind of educated . . . he's the CPA guy[.]" Doc. No. 67, p. 7. Even construing these facts in the light most favorable to 25th Street as the nonmoving party, 25th Street has failed to allege that this relationship arose "under circumstances which reflect a borrower's reposing of faith, confidence and trust in a bank with resulting domination, control or influence exercised by the bank over the borrower's affairs." Baker Boyer Nat'l Bank, 2019 ND 76, ¶ 16. There is no evidence showing that Bremer was somehow involved in the day-to-day business and management of 25th Street.

Additionally, neither party disputes that although 25th Street had a variable interest rate under the Loan, it was 25th Street who wanted a fixed interest rate to mitigate risk. Doc. No. 48, p. 32 (Olson represented that it "didn't matter to me what [Bremer] did. I was getting the ten-year fixed-rate loan. The fixed payment, fixed interest rate. That's all I was focused on."); Doc. No. 67, p. 7 (When asked why 25th Group decided to go with a swap on this transaction, Jordahl stated "I don't think the swap was the discussion point. I think we looked at it, it was a fixed rate and it was a fixed term, And so I think with that – rates looked competitive and it was a fixed term, and you know, it was all in, and we jumped down the road on to another project."). Accordingly, even

31

construing all facts in the light most favorable to 25th Street, the Court concludes that, based on the undisputed facts before it, Bremer's alleged representations to 25th Street do not show a special circumstance giving rise to a fiduciary relationship. As such, 25th Street's breach of fiduciary duty claim fails as a matter of law, and the Court grants Bremer's motion for summary judgment as to that claim. See Cousineau, 2001 WL 1640118, at *3 (explaining "if a plaintiff cannot support each element of its claim, summary judgment must be granted, because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.").

### 6.     Unlawful Sales or Advertising Practices (count III)

Bremer also moves for summary judgment on 25th Street's unlawful sales or advertising practices (count III). As to the unlawful sales or advertising practices claim, the North Dakota Supreme Court has said:

> The Unlawful Sales or Advertising Practices Act prohibits "any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." N.D.C.C. § 51-15-02. Under the Act, "[s]ale means any charitable solicitation or any sale, offer for sale, or attempt to sell any merchandise [including services] for any consideration." N.D.C.C. § 51-15-01(5). Alleged misrepresentations or omissions not "made in connection with the sale or advertisement of any merchandise" are not actionable under the Act. Thimjon Farms P'ship v. First Int'l Bank & Trust, 2013 ND 160, ¶ 26, 837 N.W.2d 327.

Krebsbach v. Trinity Hosps., Inc., 2020 ND 24, ¶ 30, 938 N.W.2d 133. Stated another way, North Dakota Century Code section 51-15-02 prohibits deceptive and fraudulent conduct that a party relies on "in connection with" a sale or advertisement of merchandise. "Sale" means "any charitable solicitation or any sale, offer for sale, or attempt to sell any merchandise for any consideration," and "'Advertisement' includes the attempt by publication, dissemination, solicitation, or circulation, oral or written, to induce, directly or indirectly, any person to enter into

any obligation or acquire any title or interest in any merchandise." N.D. Cent. Code Ann. § 51-15-01(1), (5).

Here, the unlawful sales or advertising practices claim fails as a matter of law per the plain language of the statute.  In support of its claim, 25th Street alleges several misrepresentations by Bremer, including valuation statements and misrepresentations as to the valuation of the swap at termination.  Doc. No. 43, pp. 28-29.  Significantly though, all of these alleged misrepresentations, which concern valuation once 25th Street decided to refinance, occurred several years after any "sale" or "advertisement" between Bremer and 25th Street and were not made "in connection with" any sale or advertisement. Instead, the alleged misrepresentations cited by 25th Street are better characterized as disputes over the termination of the Swap Agreement, the resulting consequences of the termination and the valuation of the swap, and the operative terms of the Swap Agreement at the heart of the breach of contract claim. Moreover, 25th Street acknowledges the alleged misrepresentations at issue occurred around the termination of the Swap Agreement and offers no evidence that it relied on the alleged misrepresentations "in connection with" any sale or advertising. Doc. No. 43, pp. 31-34. Accordingly, and consistent with the plain language of the statute, the unlawful sales or advertising practices claim fails as a matter of law, and the Court grants Bremer's motion for summary judgment as to that claim. See Cousineau, 2001 WL 1640118, at *3 (explaining if a plaintiff cannot support each element of its claim, summary judgment must be granted).

### 7.    Unjust Enrichment (count VII)

Finally, Bremer moves for summary judgment on 25th Street's unjust enrichment claim. To this claim, 25th Street alleges that Bremer has been enriched by 25th Street's "payment and

fees" and that 25th Street has "been impoverished because Bremer required [it] to pay the incorrect, inflated Early Termination Amount." Doc. No. 1-3, p. 7.

> As well-stated by the North Dakota Supreme Court:
>
> Unjust enrichment is a broad, equitable doctrine which rests upon quasi or constructive contracts implied by law to prevent a person from unjustly enriching himself at the expense of another. To recover under a theory of unjust enrichment, the plaintiff must prove: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) the absence of a justification for the enrichment and impoverishment, and (5) the absence of a remedy provided by law. The theory may be invoked when a person has and retains money or benefits which in justice and equity belong to another. For a complainant to recover, it is sufficient if another has, without justification, obtained a benefit at the direct expense of the complainant, who then has no legal means of retrieving it. The essential element in recovering under the theory is the receipt of a benefit by the defendant from the plaintiff which would be inequitable to retain without paying for its value.

McDougall v. AgCountry Farm Credit Servs., PCA, 2020 ND 6, ¶ 21, 937 N.W.2d 546 (quoting McColl Farms, LLC v. Pflaum, 2013 ND 169, ¶ 18, 837 N.W.2d 359). Moreover, "it is well-settled that unjust enrichment applies only in the absence of a contract between the parties, and there can be no implied-in-law contract when there is an express contract between the parties relative to the same subject matter." Ritter, Laber & Assocs., Inc. v. Koch Oil, Inc., 2004 ND 117, ¶ 28, 680 N.W.2d 634 (internal citation omitted). Indeed, "when the parties had voluntarily entered into an express written contract which defined their rights, unjust enrichment was not available." Id. (internal citation omitted).

Even viewing the facts in the light most favorable to 25th Street, the nonmoving party, the Court concludes that the Swap Agreement is an express written contractual agreement that defines the relationship between 25th Street and Bremer. Recognizing the existence of an express contract, 25th Street instead argues that if Bremer is correct in its argument that the "agreement in question does not require it to act in good faith and use commercially reasonable procedures with respect

to the termination of the swap" then "there is not an express contractual agreement on the 'subject matter' of what is and is not good faith and commercially reasonable conduct." Doc. No. 43, p. 40. The Court disagrees.

As explained above, 25th Street's claim for a breach of good faith and fair dealing claim is duplicative of its breach of contract claim. As such, the Court dismissed the breach of good faith and fair dealing claims. Therefore, to the extent 25th Street relies on an argument regarding good faith and fair dealing, that issue is subsumed by the contractual agreement between 25th Street and Bremer, the Swap Agreement, and thus is part of the same subject matter as 25th Street's breach of contract cause of action. Accordingly, because there is an express contract between the parties on the same subject matter, 25th Street is not entitled to recover under unjust enrichment. The Court, therefore, grants Bremer's motion for summary judgment as to this claim.

## III.   <u>CONCLUSION</u>

The Court has reviewed the record, the parties' filings, and the relevant legal authority. 25th Street's motion for partial summary judgment (Doc. No. 33) is **DENIED**. Additionally, Bremer's motion for summary judgment (Doc. No. 38) is **GRANTED IN PART AND DENIED IN PART**. In summary, the Court grants Bremer's summary judgment and dismisses with prejudice the following claims: breach of the covenant of good faith and fair dealing (count V), negligent misrepresentation claim (count IV), breach of fiduciary duty (count VI), unlawful sales or advertising practices (count III), and unjust enrichment (count VII). The remaining claims for

trial are the breach of contract claim (count I) and declaratory judgment claim (count II). The Court will reach out to counsel in the coming days to discuss resetting the case for trial.

**IT IS SO ORDERED**.

Dated this 14th day of July, 2022.

/s/ Peter D. Welte
Peter D. Welte, Chief Judge
United States District Court